IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


ANGELA M.,[1]

                    Plaintiff,                                    Case No. 3:18-cv-02133-YY

        v.
                                                                 OPINION AND ORDER
COMMISSIONER SOCIAL SECURITY
ADMINISTRATION,

                    Defendant.


YOU, Magistrate Judge:

        Plaintiff Angela M. seeks judicial review of the denial of Title II disability insurance

benefits by the Commissioner of Social Security ("Commissioner").  This court has jurisdiction

to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(g)(3).

For the reasons set forth below, the Commissioner's decision is REVERSED and REMANDED

for the immediate award of benefits.

---

[1] In the interest of privacy, the court uses only plaintiff's first name and the initial of her last
name and does the same for other individuals whose identification could affect plaintiff's
privacy.

## PROCEDURAL HISTORY

Plaintiff protectively filed a Title II application for disability insurance benefits on November 21, 2014, alleging a disability onset date of March 28, 2013. Tr. 209. Her date last insured is December 31, 2015. Tr. 16. The Commissioner denied plaintiff's claim on April 9, 2015, and again upon reconsideration on July 10, 2015. Tr. 16. Plaintiff filed a written request for a hearing on August 4, 2015, and appeared for a hearing before Administrative Law Judge ("ALJ") Allen G. Erickson, on August 4, 2017. Tr. 47. After receiving testimony from plaintiff and a vocational expert ("VE"), Francene M. Geers, the ALJ issued a decision, finding plaintiff not disabled within the meaning of the Act. Tr. 16. The Appeals Council denied plaintiff's request for review on November 24, 2018, and plaintiff filed her complaint with this court on December 12, 2018. Tr. 1. The ALJ's decision is the Commissioner's final decision and subject to review judicial review by this court. 42 U.S.C. § 405(g); 20 C.F.R. § 422.210.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). This court may not substitute its judgment for that of the Commissioner when the evidence can reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from

the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted); see also *Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920; *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

At step one, the ALJ found that plaintiff did not engage in substantial gainful activity from her alleged onset date of March 28, 2013, through her date last insured of December 31, 2015. Tr. 18. At step two, the ALJ determined that plaintiff suffered from the following severe medical conditions: multiple sclerosis, obesity, bipolar disorder, anxiety disorder, and panic disorder. Tr. 18.

At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 19. The ALJ next assessed plaintiff's residual functional capacity ("RFC") and determined that she could perform sedentary work as defined in 20 C.F.R. 404.1567(a), with the following limitations:

> She was unable to climb ladders, ropes, or scaffolds. She was able to climb ramps and stairs occasionally. She was able to balance, stoop, kneel, crouch, and crawl occasionally. She was able to tolerate occasional exposure to hazards, vibration, and extreme temperatures and humidity. She was able to understand, remember, and apply short and simple instructions while performing routine tasks in an environment not involving fast-paced production. She was able to make simple decisions. She was able to have occasional interaction with the general public.

Tr. 20.

At step four, the ALJ found plaintiff was unable to perform her past relevant work as a middle school teacher. Tr. 34.

At step five, the ALJ found that considering plaintiff's age, education, work experience, and RFC, she could perform jobs that existed in significant numbers in the national economy, including addresser, cutter-and-paster, and surveillance system monitor. Tr. 35. Thus, the ALJ concluded that plaintiff was not disabled at any time from March 28, 2013, the alleged onset date, through December 31, 2015, the date last insured. *Id.*

## DISCUSSION

Plaintiff contends that the ALJ erroneously rejected her subjective symptom testimony, the opinion of her treating psychiatrist, and her mother's testimony. Plaintiff also contends that the Commissioner failed to meet his burden at step five.

## I.      Subjective Symptom Testimony

### A.      Relevant Law

A two-step process is employed for evaluating a claimant's testimony regarding the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). When doing so, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

"Second, if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of [the claimant's] symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

Effective March 28, 2016, the Commissioner superseded Social Security Ruling ("SSR") 96-7p, governing the assessment of a claimant's "credibility," and replaced it with SSR 16-3p. *See* SSR 16-3p, *available at* 2016 WL 1119029. SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all of the evidence in an individual's record when evaluating the intensity and persistence of symptoms. *Id.* at *1-2. The ALJ must examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

### B. Analysis

The ALJ found that plaintiff's "severe medically determinable impairments could reasonably be expected to cause the alleged symptoms," and did not find that she was malingering. Tr. 22. However, the ALJ ultimately concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" *Id.*

Plaintiff argues that the ALJ's "twelve-page list of evidence . . . extracted from the record, without any analysis, . . . followed . . . [by] a single paragraph of vague, conclusory and unexplained reasons for rejecting an unidentified selection of Plaintiff's reported limitations," is insufficient for the court to determine "which of [her] reported symptoms the ALJ rejected and why." Pl. Br. 9, 11, ECF #12. Plaintiff contends that "the ALJ never identified which symptoms were reasonably related to the medically determinable impairments he had identified, or which testimony he found not to be credible." *Id.* at 12. Plaintiff cites ***Brown-Hunter v. Colvin***, 806 F.3d 487, 494 (9th Cir. 2015), and *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014), in support.

In *Brown-Hunter*, the ALJ "did not specifically identify any . . . inconsistencies" between the claimant's testimony and the record, but instead "simply stated her non-credibility conclusion and then summarized the medical evidence supporting her RFC determination." 806 F.3d at 494. The Ninth Circuit held that, "[a]lthough the ALJ summarized a significant portion of the administrative record in support of her RFC determination, providing a summary of medical evidence in support of a residual functional capacity finding is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Id.* (emphasis in original). "Although the ALJ's analysis need not be extensive, the ALJ must

provide some reasoning in order for [the court] to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence." *Id.* "To support a lack of credibility finding, the ALJ [is] required to 'point to specific facts in the record which demonstrate that [the claimant] is in less pain than she claims.'" *Vasquez*, 572 F.3d at 592 (quoting *Dodrill*, 12 F.3d at 918).

In *Treichler*, the Ninth Circuit explained that "to ensure [judicial] review is meaningful, . . . we require the ALJ to 'specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines the testimony.'" 775 F.3d at 1102 (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001)). "That means '[g]eneral findings are insufficient.'" *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). However, any error by the ALJ is harmless "if the agency's path may reasonably be discerned," even if the agency "explains its decision with less than ideal clarity." *Id.* at 1099 (quoting *Alaska Dep't of Envtl. Conserv. v. EPA*, 540 U.S. 461, 497 (2004)) (internal quotation marks omitted).

Here, in crafting the RFC, the ALJ first recited a lengthy and detailed summary of plaintiff's claimed symptoms:

> The claimant alleged in her initial disability reports that she was limited in her ability to work due to bipolar, mania, depression, suicidal thoughts, rapid cycling, anxiety, cognitive issues, headache, delayed sleep phase disorder, MTHER gene mutation, and cervical radicular pain (lE; 3E2). She alleged symptoms of sleep disturbance; problems with concentration, memory, thinking, guilt, worthlessness, fatigue, loss of interest, paranoid thinking, hyperactivity, flight of ideas, pressured speech, and distractibility; eye pain, optic neuritis, paresthesia, muscle weakness, bladder issues, nerve pain, muscle spasms involuntary movements, and upper and lower extremity pain (1E).

> In her Function Report-Adult, she alleged limitations in all exertional and 11011-exertional activities (6E6). She stated that she lived in a duplex with her family (6El). She stated that when she was feeling well, she was able to care for her children, ages 3 and 8, with help from her mother during the day (6E2). She stated that her mother prepared lunch and dinner and sometimes drove her to appointments. She alleged problems with blow-drying her hair due to an inability

to hold up her arms and sensitivity to heat; sometimes needing help from her husband to lift her out of the tub; and frequent urination and urinary accidents (6E3). Otherwise, she reported no problems with dressing, feeding herself, and other personal care activities. She stated that she needed reminders to pay bills and attend doctor's appointments but needed no reminders to take medication. She reported that she was able to prepare simple meals, do cleaning and laundry sometimes, go out alone, and drive a car (6E3-4). She stated that she was sometimes able to manage her personal finances, except when fatigued or otherwise symptomatic (6E5). She described her hobbies to include scrapbooking, reading, television, camping, piano playing, fishing, hiking, yardwork/gardening, and baking (6E5). She stated that she did not engage in her hobbies often due to fatigue and pain. She reported that once a week she spent time with others by watching sports, playing board games or bingo, or talking. She alleged that she was unable to lift more than 25 pounds or walk more than 5 to 30 minutes before needing to rest (6E6). She stated that had an average ability to follow written instructions but needed repeating of spoken instructions. She reported no problems getting along with authority figures but was easily agitated when dealing with family, friends, neighbors and others. She reported problems handling stress and changes in routine (6E7). She stated that in December 2014 she began wearing prescribed glasses for driving, reading, and watching television. She alleged medication side effects of increased thirst from Lithium and stomach pain and flushing from Tecfidera.

She alleged in her appeal for reconsideration that her health was declining with her symptoms increasing and worsening (8E2, 12). In her appeal for a hearing, she alleged an ongoing worsening of her symptoms and curtailment in functioning (10E2, 11). She also alleged gastrointestinal issue and vision blurriness. At the hearing, the claimant alleged fatigue, tingling, urinary incontinence, and mental health symptoms limited her ability to work and function.

Tr. 21-22.

The ALJ then provided a very lengthy and detailed recitation of plaintiff's treatment records, but without any particular analysis. Tr. 22-32. Thereafter, the ALJ concluded:

After carefully reviewing the record, the undersigned finds that the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms are not fully consistent with the medical evidence and other evidence of record during the period through her date last insured. While she was certainly limited to some degree, the evidence does not support greater limitation than those assessed in this decision. As discussed in detail in this decision, records from treating neurologists show that the multiple sclerosis symptoms improved and were stable with medication management (5F, 9F, 21F). Imaging studies shows no worsening or active disease. With regard to mental health, psychiatric treatment records show that the claimant's symptoms stabilized with appropriate medication compliance (7F, 14F, 21F, 22F, 35F). Mental status examinations, as discussed in

this decision, were consistently within normal limits. While the claimant had episodic symptom exacerbations, they did not result in the extreme degree of chronic limitation alleged by the claimant.

Tr. 32.

Plaintiff takes issue with the ALJ's cursory and unexplained conclusions regarding her multiple sclerosis and mental health symptoms. Pl. Br. 12-17. The court discusses each of these matters in turn.

### 1.    Multiple Sclerosis

As noted, the ALJ concluded: "[R]ecords from treating neurologists show that [plaintiff's] multiple sclerosis symptoms improved and were stable with medication management (5F, 9F, 21F). Imaging studies shows no worsening or active disease." Tr. 32. The law allows an ALJ to consider the effectiveness of medication and treatment as a factor in determining the severity of a plaintiff's symptoms. *See* 20 C.F.R. § 404.1529(c)(3) (in assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication"); SSR 96–7p, available at 1996 WL 374186, at *3 (among other factors, the ALJ may consider the "type, dosage, effectiveness, and side effects of any medication the individual takes" as well as "[t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms"); *Tommasetti*, 533 F.3d at 1040 (holding that credibility is undermined when disability is controlled by medication); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196–97 (9th Cir. 2004) (noting that medical records inconsistent with a claimant's allegations are a permissible reason to find claimant not credible); *Orteza*, 50 F.3d at 750 (holding ALJ may consider effectiveness of pain medication in assessing claimant's credibility). "Impairments that can be controlled effectively with medication are not disabling[.]" *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006).

In support of his conclusions, the ALJ cites medical records from Providence Neurological Specialties and Oregon Health Sciences University ("OHSU") from April 17, 2013, through May 5, 2015. Tr. 432-506 ("5F"), 636-701 ("9F"), 978-990 ("21F"). The ALJ did not specifically tie any particular portions of these records, which span 154 pages, to any particular symptoms he was discrediting. This court has reviewed these records, and they indeed contain notations that plaintiff's multiple sclerosis was "stable" and imaging studies showed no "active" disease. Tr. 454 (repeat MRI in June 2013 was stable); Tr. 458 (June 27, 2013 exam was stable); Tr. 464 (July 23, 2013 exam was stable); Tr. 476 (August 2013 MRI was stable); Tr. 652 (February 2014 MRI was stable); Tr. 659 (August 29, 2014 exam was stable and multiple sclerosis "has remained stable with no suggestion of relapse"); Tr. 660 (September 2014 MRI was stable); Tr. 665 (October 6, 2014 exam was stable with no new findings); Tr. 693 (June 3, 2013 MRI indicated "[n]othing to suggest active disease"; "Stable mild plaque load without evidence of active disease."); Tr. 695-96 (August 9, 2013 MRI presented "[s]table disease burden" and contained "[n]o findings to suggest active demyelination"); Tr. 698 (February 3, 2014 MRI presented "[s]table number and size of brain lesions" and "no evidence for active disease"); Tr. 984 (May 18, 2015 presented "[n]o evidence of . . . active demyelination"); Tr. 981 (November 2014 MRI was stable).

Also, as the ALJ observed, plaintiff's multiple sclerosis has been treated with medication. Plaintiff began taking Tecfidera in May 2013, Tr. 440-41, 454, reported feeling better on that medication in August 2013, Tr. 472, and by July 2014, was doing well on it. Tr. 648, 652. While on Tecfidera, plaintiff had "four probably clinical relapses" for which she received an additional medication, Solumedrol, a steroid. Tr. 432, 447, 471, 482. However, as plaintiff testified at the hearing, she stopped taking Tecfidera after two years because she **was suffering**

from "severe stomach issues," including hospital treatment with IV fluids. Tr. 78-79. Records in fact corroborate that plaintiff "stopped Tecfidera in May 2015 due to GI side effects and was ultimately diagnosed with eosinophlllc gastritis." Tr. 1749; *see also* Tr. 1745 (noting plaintiff's "poor tolerance" to Tecfidera due to "ongoing GI issues"). The ALJ did not address plaintiff's testimony in this regard or recognize that her Tecfidera use was discontinued more than six months before the date last insured.

Moreover, despite taking medication, plaintiff was "[s]ymptomatically . . . most bothered by severe fatigue." Tr. 983. Plaintiff repeatedly complained of fatigue throughout the relevant period. Tr. 443, 642, 648. Notably, in July 2014, plaintiff complained of "extreme" fatigue, which prevented her from "even walk[ing] around her house without sitting to rest." Tr. 648, 654. Plaintiff's fatigue was no better throughout 2015. On March 19, 2015, while in the emergency room for chest pains, plaintiff complained of "increased generalized fatigue for the past several weeks." Tr. 911. In April 2015, plaintiff complained that her "worst problem" was still "severe fatigue." Tr. 981.

At the hearing, plaintiff testified that fatigue was "one of [her] biggest symptoms." Tr. 70. Plaintiff described the fatigue as "debilitating," and explained: "It's to the point where like my kids will try to wake me up and I can't wake up. . . . [T]here's also days where I'm so fatigued that I can barely unload the dishwasher." Tr. 70. She testified that when "they diagnosed me with MS and from that day forward, the fatigue just never really got any better." Tr. 78. From plaintiff's perspective, her "MS has stayed just the same. Nothing ever really got better." Tr. 90. Although there were times she had a "good week," it "seemed to follow pretty quickly with . . . going right back downhill." Tr. 90.

Medical providers have consistently concluded that plaintiff's fatigue is at least partially caused by her multiple sclerosis. Tr. 640, 646 ("MS is likely contributing to" fatigue); Tr. 652 ("Most debilitating at this point is her fatigue which may in part be related to both MS and mood disorder."); Tr. 983. Doctors have considered prescribing medications to combat plaintiff's fatigue, Tr. 659, but ultimately chose not to use stimulants due to plaintiff's bipolar disorder and "[history of] mania requiring hospitalization." Tr. 983. Thus, plaintiff's fatigue was not effectively treated with medication.

The ALJ recognized that the medical records contain numerous references to plaintiff's fatigue and that plaintiff had even testified to this. Tr. 20 (noting plaintiff was able to manage her personal finances, except when fatigued or otherwise symptomatic); Tr. 21 (noting plaintiff did not engage in hobbies due to her fatigue and pain); Tr. 22 (recognizing plaintiff testified about her fatigue at the hearing); Tr. 23 (observing that in May 2013, plaintiff complained of fatigue); Tr. 24 (noting plaintiff complained of fatigue in July 2013); Tr. 24 (recognizing plaintiff suffered "persistent fatigue" in August 2013); Tr. 26 (noting plaintiff complained of fatigue in April 2014); Tr. 27 (noting plaintiff complained of fatigue in August 2014); Tr. 31 (recognizing that plaintiff needed help with her children due to fatigue). However, the ALJ did not specifically explain why he was discounting what plaintiff described was one of her "biggest" and "debilitating" symptoms.

In *Castillo v. Astrue*, the ALJ similarly did not "cite to any specific areas of the record, but rather cite[d] to larger exhibits reflecting [the plaintiff's] treatment record," and concluded that plaintiff was stable on medication. 310 F. App'x 94, 96 (9th Cir. 2009) (cited pursuant to Ninth Circuit Rule 36-3). The Ninth Circuit found that "this generalized statement" could not

"support an adverse credibility finding," where the record contained evidence that the plaintiff

suffered "continued difficulties while on medication." *Id.*

Here, as well, the ALJ erred by rejecting plaintiff's continued reports of fatigue without

specific, clear and convincing reasons. The ALJ's determination that plaintiff's "multiple

sclerosis symptoms improved" is unsupported by the record, which is replete with references to

plaintiff's "severe" and "debilitating" fatigue. While the medical records indicate in places that

plaintiff's multiple sclerosis was "stable," as this case illustrates, "an impairment, though stable,

can still be disabling." *Banua v. Colvin*, No. SA CV 12-0804 JCG, 2013 WL 1855802, at *1

(C.D. Cal. Apr. 30, 2013); *see also Brian P. v. Comm'r of Soc. Sec.*, No. 2:18-CV-00232-JTR,

2019 WL 2330891, at *4 (E.D. Wash. May 31, 2019) (noting that "improvement is not the same

as the elimination of symptoms"); *Jones v. Berryhill*, No. 3:15-CV-00539-JE, 2017 WL 980554,

at *10 (D. Or. Mar. 13, 2017) ("[E]ven assuming plaintiff's treatment course was stable, the

record does not reflect that she was pain-free, or, more importantly, that her testimony

exaggerated the severity of her symptoms.").

### 2. Mental Health

The ALJ concluded that, "[w]ith regard to mental health, psychiatric treatment records

show that the claimant's symptoms stabilized with appropriate medication compliance (7F, 14F,

21F, 22F, 35F)." Tr. 32. The ALJ noted that "[m]ental status examinations . . . were

consistently within normal limits," and "[w]hile the claimant had episodic symptom

exacerbations, they did not result in the extreme degree of chronic limitation alleged by the

claimant." *Id*.

Again, the ALJ cited to large portions of treatment records—263 pages in total—but

never tied the specific symptoms or testimony he was discrediting with the specific portions of

the records he was relying upon to do so.  Moreover, the record reflects that plaintiff's symptoms were, in fact, less than "stabilized."  Notably, in July 2014, plaintiff's mood began to "worsen significantly" and she was having increasing suicidal thoughts.  Tr. 592.  By August 1, 2014, "symptoms escalated to the point that [plaintiff] spent several hours lying on her bathroom floor in the dark with persistent intrusive/ruminative suicidal thoughts.  She was afraid that if she left her bathroom she would be unable to control her behavior and may have harmed herself."  *Id*. The following day, plaintiff continued to have racing thoughts and her mood became acutely elevated.  *Id*.  She began spending significant amounts of money.  *Id.*  On August 6, 2014, she "crashed," became very depressed, and felt "out of control."  Tr. 592-93.  Because of her "substantial decompensation" and "significant increase in suicide risk," plaintiff was hospitalized on August 7, 2018.  Tr. 597.  Previously, plaintiff had attempted to commit suicide twice—once, when plaintiff was 16 years old, she overdosed on a variety of medications, and another time, when she was 18 years old, she slit her wrists, which required suturing.  Tr. 601.  While in the hospital, plaintiff's lithium dosage was increased.  Tr. 604.  Against her treating psychiatrist's recommendation, plaintiff was voluntarily discharged the following day on August 8, 2018.  *Id*.

Two months later, in October 2014, plaintiff was "[m]uch better" but "not all the way back to normal."  Tr. 809.  Her mood fluctuated from week to week; she would "feel totally fine" for three to five days and then wake up in a "depressed phase."  Tr. 812.  Additionally, her anxiety had become more problematic.  Tr. 804.

In December 2014, plaintiff reported that her mood had been "pretty good lately," but anxiety was still a problem.  Tr. 819-20.  In January 2015, plaintiff was suffering from "episodes of panic," which came in waves.  Tr. 991.  One time, she had to pull her car over because she could no longer drive.  *Id.*  Chart notes indicate that while anxiety was an "ongoing issue," it had

"worsened to the point that it is beginning to affect her functioning." Tr. 997. In February 2015, plaintiff was still suffering from ups and downs and her mood was "on and off." Tr. 999. Nearly every day, plaintiff felt afraid as if something awful might happen. Tr. 1001. Chart notes indicate that while "[m]ood stabilization has been improved since returning to her appropriate dose of lithium," "[a]nxiety/panic continue to be problematic." Tr. 1004.

In April 2015, plaintiff reported that her anxiety symptoms had worsened since her steroid treatments. Tr. 1007. Moreover, her anxiety had "not been controlled lately even prior to the steroid infusion." Tr. 1011. At one point, plaintiff refused to take her medication and was pacing around the house, throwing things. Tr. 1014. In May 2015, her anxiety symptoms continued to be problematic and she had panic attacks fairly regularly. Tr. 1023.

Plaintiff suffered her "most intense" manic episode in August 2015, just a few months before her date last insured. Tr. 1540. Plaintiff had been unable to sleep for several nights and was seeing and hearing things that were not there. Tr. 1512. She was "agitated with immense energy[,] switching to crying hysterically all within moments of each other," in what she described as a "process that repeated all night." *Id*. Her anxiety was so out of control, she could "barely ride in a car." *Id*. Prior to this, her mood had been "up and down" for the prior two weeks. Tr. 1513. Plaintiff would feel quite good for several hours to a couple of days, and then feel depressed and start crying spontaneously. *Id*. She described her anxiety as "out of control" and said, "I can't handle this anymore." Tr. 1512.

Moreover, as noted previously, the fact that plaintiff was diagnosed with both multiple sclerosis and bipolar disorder created a particularly difficult and complex situation for medication treatment. The treatment records state: "Unfortunately, med[ication] options are limited since prior antidepressant trials have induced mania and remaining options will likely

contribute to low energy." Tr. 1004. Thus, the ALJ's conclusions, including that plaintiff's "symptoms stabilized with appropriate medication compliance," are unsupported by the record and do not constitute clear and convincing reasons to reject plaintiff's subjective symptom testimony.

## III.   Dr. Lloyd

The ALJ is responsible for resolving conflicts in the medical record, including conflicting physicians' opinions. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). The law distinguishes between the opinions of three types of physicians: treating physicians, examining physicians, and non-examining physicians. *See* 20 C.F.R. § 404.1527.[2] The opinions of treating physicians are generally accorded greater weight than the opinions of non-treating physicians. 20 C.F.R. § 404.1527(c)(2); *Lester*, 81 F.3d at 830. A treating physician's opinion that is not contradicted by the opinion of another physician can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). If, however, a treating physician's opinion is contradicted by the opinion of another physician, the ALJ must provide "specific, legitimate reasons" for discrediting the treating physician's opinion. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's activities of daily living. *Tommasetti*, 533 F.3d at 1040.

---

[2] The Commissioner has issued revised regulations changing this standard for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1520c. Plaintiff's claim was filed before March 27, 2017, and therefore is controlled by 20 C.F.R. § 404.1527.

Plaintiff argues that the ALJ erroneously rejected the opinion of her treating psychiatrist, Dr. Lloyd. Pl. Br. 17. Dr. Lloyd completed a mental residual functional capacity assessment in which he found plaintiff's bipolar and anxiety caused "marked," *i.e.*, "seriously limited," impairment in multiple areas of functioning, including the ability to be punctual and maintain regular attendance and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreason number of and length of rest periods. Tr. 895-96. Dr. Lloyd also concluded that plaintiff's impairments "substantially interfere with . . . her ability to work on a regular and sustained basis at least 20% of the time." Tr. 896.

The ALJ gave "little weight" to Dr. Lloyd's opinion as follows:

> Little weight is accorded to Dr. Lloyd's May 1, 2015 opinion that the claimant had marked limitations in her ability to perform multiple work related mental activities, would miss most workdays, and be unable to work on a regular and sustained basis due to her mental impairments (19F4). His assessment is inconsistent with his corresponding treatment records and other evidence, which, as discussed in this decision, show normal mental status examinations and improvement in symptoms with sustained mental health treatment compliance.

Tr. 33.

The Commissioner argues that Dr. Lloyd's opinion was inconsistent with his treatment records, which purportedly show plaintiff's symptoms responded well to medication when she took them as prescribed. Def. Br. 4-5. However, as discussed at length above, the treatment records do not in fact show an "improvement in symptoms with sustained mental health treatment compliance," contrary to the ALJ's conclusion. Tr. 33. Moreover, the Commissioner's characterization of plaintiff's medication compliance ignores important portions of the record.

After being diagnosed with multiple sclerosis, plaintiff sought psychiatric treatment as recommended. Plaintiff was prescribed Wellbutrin in December 2013, and while she initially reported that her mood had improved, Tr. 540, her anxiety increased and then her mood "fluctuat[ed] fairly dramatically from day-to-day (and sometimes within the course of a single day)." Tr. 545 (parentheticals in original). In fact, there is a notation in plaintiff's treatment records that patients with bipolar disorder suffer an elevated risk of anxiety while on Wellbutrin. Tr. 547. Because of plaintiff's "constellation of symptoms," Wellbutrin was discontinued in March 2014. *Id.* Plaintiff's Lamotrigine dose was increased, although treatment records acknowledge that this medication does not control anxiety. Tr. 552.

In late March 2014, plaintiff reported no benefit from the increased dose of Lamotrigine, and her symptoms of depression and anxiety continued to increase. Tr. 553. "Given her continued decompensation in psychiatric symptoms," plaintiff was prescribed a bipolar depression medication, Latuda. Tr. 557. Plaintiff initially reported "substantial improvement" in depression and anxiety" after starting Latuda. Tr. 558. However, in May 2014, Latuda was discontinued due to akathisia, i.e., restlessness, and difficulty with concentration. Tr. 567. As plaintiff described it, "I feel like I'm brain damaged." Tr. 563.

In June 2014, plaintiff began olanzapine for hypomania, and she and her doctor discussed a trial of lithium because long-term use of olanzapine would present metabolic side effects. Tr. 575. Plaintiff began lithium later that month, and reported that her mood had improved and she was no longer feeling depressed. Tr. 580.

Plaintiff was taking lithium at the prescribed daily dose of 900 mg. when her depression worsened in July 2014. Tr. 586. Plaintiff sometimes forgot to take the morning dose of lithium and would take the entire dose at night. *Id.* However, because plaintiff was on controlled-

release lithium, it "should not cause significant issues to take it all at one time per day." Tr. 589.

An increase to 1200 mg. was contemplated, as well as another trial of Wellbutrin to help control plaintiff's depression. Tr. 589. Plaintiff began taking Wellbutrin again on July 26, 2014, after which her mood began to worsen significantly and she began having suicidal thoughts. Tr. 592. Plaintiff than had the incident leading to her hospitalization described at length above. During plaintiff's hospitalization, her lithium was increased to 1500 mg. and Wellbutrin was discontinued. Tr. 595, 597.

In late August 2014, plaintiff began taking a reduced dose of 1200 mg. of lithium to counter diarrhea side effects, and her doctor endorsed the reduced dose. Tr. 778, 788 (noting 1200 mg daily dosage). In late 2014, plaintiff "mistakenly" and "inadvertently lowered her lithium dose" while she was titrating off Lamictal. Tr. 813, 818. After the error was discovered, plaintiff immediately went back to taking a 1200 mg. daily dose of Lithium. Tr. 820. At around the same time, plaintiff also forgot to take gabapentin, which was initially prescribed to reduce "microarousals" and improve sleep.[3] Tr. 781, 812. Importantly, gabapentin was ultimately discontinued for worsening plaintiff's already low energy, Tr. 1532, and when plaintiff suffered her "most intense" bipolar episode in August 2015, she was taking her prescribed dose of 1200 mg. of lithium. Tr. 1529, 1535, 1540.

Thus, the record does not paint the picture of someone who was obstinate or uncooperative in taking her prescribed medication. Rather, it shows someone who tried numerous medications and combinations of medications, yet her mental health remained disabling. Contrary to the Commissioner's contention, plaintiff's occasional non-compliance

---

[3] These episodes of forgetfulness are consistent with Dr. Lloyd's assessment that plaintiff had moderate ability to remember very short and simple instructions and plaintiff's claim that she "forget[s] things a lot." Tr. 267, 894.

with a largely ineffective course of treatment does not suffice as a specific and legitimate reason for rejecting Dr. Lloyd's opinion.  Accordingly, the ALJ failed to provide "specific, legitimate reasons" for discrediting Dr. Lloyd's opinion.

## IV.    Lay-Witness Testimony

Lay-witness testimony regarding the severity of a claimant's symptoms or how an impairment affects a claimant's ability to work is competent evidence that an ALJ must take into account.  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).  To reject such testimony, an ALJ must provide "reasons that are germane to each witness."  *Rounds v. Comm'r*, 807 F.3d 996, 1007 (9th Cir. 2015) (quoting *Molina*, 674 F.3d at 1114).  Further, the reasons provided must be "specific."  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011) (citing *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009)).  Where the ALJ has provided clear and convincing reasons for rejecting the claimant's symptom testimony, and the lay witness has not described limitations beyond those alleged by the claimant, the ALJ's failure to provide germane reasons for rejecting lay testimony is harmless.  *Molina*, 674 F.3d at 1121-22.

Here, the ALJ gave plaintiff's mother's testimony little weight because her "description of [plaintiff's] limitation in functioning is similar to the degree of limitation alleged by [plaintiff], which, for the reasons explained in this decision, is unpersuasive and not fully consistent with the objective medical evidence in the record."  Tr. 33-34.  As discussed at length above, the ALJ erred in rejecting plaintiff's subjective symptom testimony on that basis.  Therefore, the ALJ erred in rejecting plaintiff's mother's testimony as well.

## V.    Step Five

While the claimant has the burden of proof with regard to steps one through four of the sequential analysis, the burden shifts to the Commissioner at step five.  20 C.F.R. § 404.1520.

The Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's RFC, age, education, and work experience. *Id.* If the Commissioner fails to meet this burden, then the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v).

The ALJ found that plaintiff could perform jobs such as surveillance system monitor, addresser, and cutter-and-paster. Tr. 35. Plaintiff argues that the surveillance system monitor position conflicts with the RFC and the addresser and cutter-and-paster positions are obsolete.

### A. Surveillance System Monitor

The Commissioner concedes the ALJ's finding that plaintiff could perform the occupation of security systems monitor, which is categorized at Reasoning Level 3 in the Dictionary of Occupational Titles ("DOT"), is "improperly supported." Def. Br. 10; *see* DOT No. 379.367-010, *available at* 1991 WL 673244.

### B. Addresser and Cutter-and-Paster

According to the DOT, an addresser "[a]ddresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing." DOT No. 209.587-010, *available at* 1991 WL 671797. The DOT states that a cutter-and-paster "[t]ears or cuts out marked articles or advertisements from newspapers and magazines, using knife or scissors," and then records the publication date and other information on the clipping. DOT No. 249.587-014, *available at* 1991 WL 672348.

Notably, in 2011, the Commissioner released a study stating "[i]t is doubtful that these jobs as described in the DOT, currently exist in significant numbers in our economy." MARK TRAPANI & DEBORAH HARKIN, SOC. SEC. ADMIN., OCCUPATIONAL AND MEDICAL-VOCATIONAL CLAIMS REVIEW STUDY (2011) ("study"), https://www.ssa.gov/oidap/ Documents/PRESENT

ATION—TRAPANI%20AND%20HARKIN--OIDAP%2005-04-11.pdf (last visited December 8, 2019).  A number of districts have relied on this study to conclude that the jobs of addresser and cutter-and-paster are obsolete.  *See Scott v. Colvin*, No. 14-cv-04051-EDL, 2015 WL 11438598, at *13 (N.D. Cal. Dec. 9, 2015); *Burney v. Berryhill*, 276 F. Supp. 3d 496, 500 (E.D.N.C. 2017); *Read v. Commissioner, Soc. Sec.*, Civ. Case No. GJH-15-2684, 2016 WL 2610117, at *5 (D. Md. May 6, 2016); *Skinner v. Berryhill*, No. CV 17-3795-PLA, 2018 WL 1631275, at *5-6 (C.D. Cal. Apr. 2, 2018).

     The Commissioner argues that the study is "outside of the record" and plaintiff therefore cannot rely on it.  Def. Br. 10 (citing 42 U.S.C. § 405(g)).  However, "[j]udicial notice is appropriate for records and 'reports of administrative bodies.'"  *United States v. 14.02 Acres of Land More or Less in Fresno Cty.*, 547 F.3d 943, 955 (9th Cir. 2008) (citing *Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1954).  Therefore, the court takes judicial notice of the study.

     Moreover, the court need not even rely on the study to conclude that the addresser and cutter-and-paster jobs, as described in the DOT, are obsolete.  Substantial evidence is "such relevant evidence as *a reasonable mind* might accept as adequate to support [the ALJ's] conclusion."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (emphasis added) (citations omitted).  For example, the Ninth Circuit has found that "[a] reasonable mind would not accept that the VE's testimony that there are 3,600 head dance hall hostess positions in the local economy and 342,000 in the national economy."  *Farias v. Colvin*, 519 F. App'x. 439, 440 (9th Cir. 2013) (cited pursuant to Ninth Circuit Rule 36-3).  Here, the VE testified that there are 20,051 cutter-and-paster jobs in the national economy.  However, a reasonable mind would doubt this testimony because "since 1991 the use of computers has become increasingly common

in the work environment, likely reducing the need for the physical press clipping task." *Scott*, 2015 WL 11438598, at \*12-13 (holding that a reasonable mind could not accept VE testimony that there were 640 cutter-and-paster jobs in California).[4]

The same reasoning applies to the addresser position. The VE testified that there are over 11,000 addresser jobs in the national economy. However, as the court explained in *Skinner*, a reasonable mind would not accept that addresser jobs exist in such numbers:

> [I]t is not unreasonable to assume that the occupation of 'addresser,' which—as described by the DOT—provides for addressing envelopes *by hand or by typewriter*, is an occupation that has significantly dwindled in number since 1991 in light of technological advances. That being the case, a reasonable mind would not accept the VE's testimony that there are over 3,000 such positions in the region of California alone, or even that there are over 10,000 in the national economy.

2018 WL 1631275, at \*6 (emphasis in original); *see also Read*, 2016 WL 2610117, at \*6 (holding that given the nature of the cutter-and-paster and addresser jobs, "a reasonable person would question whether even small numbers of those positions remain available in the United States"). Accordingly, the ALJ erred in relying on the VE's testimony that plaintiff could perform the obsolete jobs of addresser and cutter-and-paster.

The Commissioner argues that the jobs listed by the VE are merely "representative" of the occupations that plaintiff could perform and does not eliminate the entire universe of sedentary jobs. Def. Br. 10. However, at step five, the burden is on the Commissioner to show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1560(b)(3). "There are two ways for the Commissioner to meet the burden of showing that there is other work in 'significant numbers' in the national economy that claimant can perform: (a) by the testimony of a vocational expert, or

---

[4] The DOT has not been updated since 1991.

(b) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."

*Tackett*, 180 F.3d at 1100–01. Here, the three positions identified by the VE have been

invalidated, and there is no other VE testimony or reference to the Medical-Vocational

Guidelines "showing that there is other work in 'significant numbers' in the national economy

that [plaintiff] can perform." *Id.* Thus, the Commissioner has failed to meet his burden.

## VI.     Credit-As-True Analysis

When a court determines the Commissioner erred in some respect in making a decision to

deny benefits, the court may affirm, modify, or reverse the Commissioner's decision "with or

without remanding the cause for a rehearing." *Treichler*, 775 F.3d at 1099 (quoting 42 U.S.C.

§ 405(g)). In determining whether to remand for further proceedings or immediate payment of

benefits, the Ninth Circuit employs the "credit-as-true" standard when the following requisites

are met: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) the

record has been fully developed and further proceedings would serve no useful purpose, and

(3) if the improperly discredited evidence were credited as true, the ALJ would be required to

find the plaintiff disabled on remand. *Garrison*, 759 F.3d 995, 1020 (9th Cir. 2014) (citations

omitted). Even if all of the requisites are met, however, the court may still remand for further

proceedings, "when the record as a whole creates serious doubt as to whether the claimant is, in

fact, disabled[.]" *Id.* at 1021.

Here, the first requisite has been met, as the ALJ failed to provide legally sufficient

reasons for rejecting plaintiff's subjective symptom testimony and for giving little weight to Dr.

Lloyd's opinion.

The second requisite is also met. There are no "significant factual conflicts in the record

between [the claimant's] testimony and objective medical evidence." *Treichler*, 775 F.3d at

1104.  Moreover, all "crucial questions" have been resolved.  *See Brown-Hunter*, 806 F.3d at

495-96.  Where the "crucial questions" have been resolved, further administrative proceedings

would serve no "useful purpose."  *Id.*

With respect to the third requisite, remand for benefits is proper if crediting the

improperly discredited evidence would require the ALJ to find the plaintiff disabled on remand.

*Garrison*, 759 F.3d at 1020.  Here, the ALJ erred in giving little weight to the opinion of Dr.

Lloyd who found that plaintiff's "impairment substantially interfere[d] with [her] ability to work

on a regular and sustained basis at least 20% of the time."  Tr. 896.  Dr. Lloyd found that

plaintiff's "ability to perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances" was marked, i.e., seriously limited.  Tr. 894.  Plaintiff's

ability to "tolerate normal levels of stress" and "complete a normal workday and workweek

without interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number of and length of rest periods" was also marked.  Tr. 895-96.

Dr. Lloyd further found that plaintiff "would not be able to adequately attend to work

responsibilities with her current symptom burden," which "ha[d] not been at a level that would

allow employment for several months."  Tr. 896.  Moreover, plaintiff and her mother testified

that because of plaintiff's fatigue, she needs significant help from her mother in caring for her

children and household, further supporting remand for an award of benefits.  Tr. 70-76, 93-96.

When the improperly discredited medical opinion evidence and testimony is credited, it

establishes that plaintiff was unable to sustain full-time work.  "Generally, in order to be eligible

for disability benefits under the Social Security Act, the person must be unable to sustain full-

time work eight hours per day, five days per week."  *Mulanax v. Comm'r of Soc. Sec.*, 293 F.

App'x. 522, 523 (9th Cir. 2008); *see also Willis v. Callahan*, 979 F. Supp. 1299, 1305 (D. Or.

1997) ("If the claimant has stopped working, his or her residual functioning capacity is determined by asking whether the claimant can work an eight-hour day. Thus, once a claimant has stopped working, she is considered disabled if she is only able to perform part-time work.") (citing *Ratto v. Secretary, Dep't of Health & Human Servs.*, 839 F. Supp. 1415, 1430-31 (D. Or. 1993)); SSR 96-8p (The "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."). The vocational expert also testified that if plaintiff had to miss more than one work day per month, or had to take two or more rest breaks of 20 minutes or more per day, or was off task more than 15% of the time during the work day, "there'd be no work [she] could do." Tr. 105.

The record as a whole does not create serious doubt as to whether plaintiff is disabled. Accordingly, the credit-as-true standard has been met. The Commissioner's decision is therefore reversed, and the matter is remanded for the immediate award of benefits.

## CONCLUSION

The Commissioner's decision is REVERSED and REMANDED for the immediate award of benefits.

IT IS SO ORDERED.

DATED December 11, 2019.

/s/ Youlee Yim You

Youlee Yim You
United States Magistrate Judge